VERN NELLIS, Appellee, v. S. R. QUEALY et al., Appellants.

No. 46801.

FEBRUARY 5, 1946.

REHEARING DENIED APRIL 5, 1946.

508

Thomas M. Healy, of Fort Dodge, and Miller, Huebner & Miller, of Des Moines, for appellants.

Mitchell & Mitchell, of Fort Dodge, for appellee.

MULRONEY, J.— Claimant, Vern Nellis, sought workmen's compensation from his employer, S. R. Quealy, and the latter's insurer, Hartford Accident & Indemnity Company. The claim was for partial loss of vision in claimant's eye, resulting, as claimant alleged, from some material falling into his eye while he was cleaning and scraping his employer's dump truck. The arbitration hearing before the deputy industrial commissioner resulted in a denial of the claim, but upon review the industrial commissioner reversed this decision and made an award in favor of claimant for $15 a week for fifty weeks, with interest and doctors' bills. Upon the insurer's appeal to the district court of Webster County, Iowa, the commissioner's award was affirmed and the insurer appeals to this court.

Defendants state that the sole question on this appeal is as to the causal connection between the injury to claimant and his loss of vision. Defendants argue "that there is not sufficient competent evidence in the record to support the Industrial Commissioner's finding and the District Court's affirmance thereof that there was a causal connection between the loss of vision in appellee's left eye and any injury sustained by him arising out of and in the course of his employment."

We turn to the review of the testimony contained in the commissioner's opinion:

"In the early afternoon of December 3, 1943, the date of the alleged injury, the claimant with the use of a putty knife and wire brush was scraping and cleaning rust, paint scales and debris from the underside of a truck body which was raised to a dumping position in order that he could better see his work, and while looking up he testified that something got in his left eye. He rubbed his eye which pained him and it became inflamed, but he continued to work. Later the same afternoon he reported the incident to his boss, who told him to go see a doctor. However, he continued working until around five o'clock in spite of the alleged pain and discomfort.

"The claimant testified, as did his wife, that he had never

experienced trouble with his eyes of any nature at any time prior to December 3, 1943.

"The next day, December 4, 1943, he did not go to work. Effort to get an appointment with an eye doctor failed, but he did go see Dr. Walker, a chiropractor, who had previously treated his neck, for another adjustment or treatment, and was in hopes the doctor could tell if anything was in his eye. While there Dr. Walker observed the inflamed condition and examined the eye, observing numerous brown spots back deep under and on the top of the eyeball. Dr. Walker told Mr. Nellis that he should see an eye specialist. Upon his return home his wife again attempted to get an appointment with either one of three eye men in Ft. Dodge, but it was one week later or on December 11th before he could get an appointment. During that week home remedies consisting of cold and hot applications were applied without results, and on Saturday, December 11th, he saw Dr. Chase, who examined the claimant's eye and prescribed medicine. The claimant followed the doctor's instructions in using the prescriptions and three or four days later he called the doctor and told him the eye was no better. He continued the same treatment and on December 18, 1943, claimant went back to Dr. Chase's office, who could not see him and through his office girl was instructed to continue with the same medicine.

"It was not until January 14th, 1944, six weeks after the eye injury or approximately five weeks before the eye was examined again by a physician, when Dr. Martin made an examination and diagnosed the condition as due to ulcers of the cornea and an iritis, which he treated from two to three times per week until the condition was relieved and the patient fitted with glasses for the correction of impaired vision of the affected eye some four or five months later."

The medical testimony was to the effect that claimant's loss of vision was caused by scar tissue resulting from ulcers, but Dr. Martin, testifying for claimant, and Dr. Chase, testifying for defendant, differed as to the probable cause of the ulcers. The claimant testified his eye has pained him all the time since the injury.

Dr. Martin testified:

"He told me he thought something got in his eye and he had gone to Dr. Chase, and if I recall correctly, he was there on one visit. * * * Q. Now in your opinion could the condition you discovered there be caused by something getting into the eye or striking the eye? A. It could have. As a matter of fact it is true ulcers are frequently caused by something getting in the eye or striking the eye. * * * He had corneal ulcers * * * You don't get any ulcers that are noninfected ulcers, but as the ordinary run of things most of you get a history of foreign body either lodging in the eye, which is probably the more common, or something which would denude the cornea. * * * Q. To sum up the discussion about ulcers, one of the most common things in producing an ulcer is getting something in the eye? A. That is right."

Dr. Martin was of the opinion that, ordinarily, if something lodged in the eye sufficient to cause the ulcer it would have to be removed, but sometimes the foreign body was washed out by tears. He found no foreign body in the eye when he examined him but when he was asked if he found any evidence of a foreign substance "having been lodged there," he replied:

"That I couldn't say. I wouldn't know that. He told me about work, something flew in his eye, but that was subsequent to January 14th, but as distinct from something falling or lodging in the eye he gave me no history of any blow to the eye, of any large object and I removed nothing from the eye."

In answer to a hypothetical question that called for his opinion as to whether the foreign material that got into claimant's eye could have been the cause of the condition found by him when he examined claimant on January 14, 1944, Dr. Martin replied: "It is possible."

We need not review Dr. Chase's testimony. It is sufficient to state that he found nothing in claimant's eye when he examined him and he was of the opinion that claimant was suffering from herpetic ulcer. Herpetic ulcers are caused by a virus and not by trauma.

Insofar as the foregoing medical testimony presents a conflict, the issue was for the commissioner. Reynolds v. George & Hoyt, 230 Iowa 1267, 300 N. W. 530; Eveland v.

Newell Constr. & Mach. Co., 236 Iowa 204, 17 N. W. 2d 524. But the defendants argue that Dr. Martin's testimony goes no further than to show a *possibility* of causal connection between the foreign substance in the eye and the ultimate loss of vision. Defendants cite Boswell v. Kearns Garden Chapel Funeral Home, 227 Iowa 344, 288 N. W. 402; Guthrie v. Iowa Gas & Elec. Co., 200 Iowa 150, 204 N. W. 225; Susich v. Norwood-White Coal Co., 207 Iowa 1129, 224 N. W. 86; Shepard v. Carnation Milk Co., 220 Iowa 466, 262 N. W. 110.

The Boswell case illustrates the rule of the above decisions to the effect that the award of the commissioner will not be permitted to stand if the evidence goes no further than to show a *possibility* of causal connection. In the Boswell case [227 Iowa 344, 348, 288 N. W. 402, 404] the doctor testified that "it would be *very possible* to pick up an infection when cleaning a post mortem room" but he also said there were "hundreds of reasons and causes that might have caused this secondary infection." (Italics supplied.) Another doctor testified: "Anything that would be the least bit irritating would make it flare up, such as * * * work [or] warm water * * *." Since the testimony in the Boswell case went no further than to say the house-cleaning operation was a possible cause or could have been a cause of the ultimate infection, we held there was insufficient proof of causal connection. However, we there said if the testimony had shown it was not only possible but fairly probable that the secondary infection was caused or had its origin in the use of the caustic materials in the house cleaning the result would have been otherwise.

Here there was direct testimony that claimant did get a foreign substance in his eye. He gave this history to Dr. Martin. Dr. Martin states that ulcers following a trauma or a foreign substance in the eye are frequent, "most common" and the "ordinary run of things" and herpetic ulcers are "extremely rare." Counsel's entire argument that Dr. Martin's testimony goes no further than conjecture as to causal connection is based upon his reply to the hypothetical question. It is true that when asked to assume the truth of a number of facts and base an opinion as to whether foreign material in the

eye could cause the condition he found on January 14th, he replied: "It is possible." But Dr. Martin's testimony must be taken in its entirety. He gave direct testimony of the ulcerous condition of the eye at the time he examined him. His testimony that such a condition as he observed in claimant's eye is usually caused by a foreign body lodging in the eye or some trauma is equally clear.

The case is much like Hinrichs v. Davenport Locomotive Works, 203 Iowa 1395, 1397, 214 N. W. 585, 586. There the claimant's loss of sight was due to a cataract which claimant alleged was caused by a small piece of steel that flew' into his eye while he was chipping some steel for his employer. There was disagreement between the medical experts as to whether or not the cataract was caused by the injury to the eye. They agreed "that a cataract might result from an injury to the eye." But we held it was the province of the industrial commissioner to accept the testimony of the experts "as seemed to him most consistent with all the testimony, and of the greater credibility." We also stated:

"The testimony of appellee that he suffered constant pain in his eye from the time of the injury must be given considerable weight on the issue of causal connection."

Not only must Dr. Martin's testimony be taken in its entirety, but all other testimony bearing upon the causal connection between the injury and the disability must be considered in determining whether the commissioner was justified in his finding that the disability resulted from the injury of December 3, 1943.

The record of a normal eye condition, then a well-established accidental injury to the eye on December 3, 1943, followed directly and immediately by pain in the eye, then eye disability that prevented claimant from working for three months, and the resulting loss of vision, are facts which the commissioner could consider and draw inferences from as bearing upon the question of causal connection. When there is added to these facts the medical testimony of Dr. Martin that an ulcerous condition was a frequent and common result of such an accident a strong record is presented that would justify the commis-

sioner's conclusion that the disability was attributable to the injury.—Affirmed.

BLISS, C. J., and HALE, SMITH, GARFIELD, MANTZ, OLIVER, and WENNERSTRUM, JJ., concur.

MILLER, J., takes no part.