Russell Burt, claimant-appellee, v. John Deere Waterloo Tractor Works of Deere Mfg. Co., employer-appellant.

No. 48763.

(Reported in 73 N.W.2d 732)

DECEMBER 13, 1955.

REHEARING DENIED MARCH 9, 1956.

Pike, Sias, Butler & Hoxie, of Waterloo, for appellant.

William W. Parker, of Waterloo, for appellee.

LARSON, J.—Claimant Russell Burt, a married man with three children, was employed by defendant at the time of the alleged injury to his lungs. Although five errors are assigned under three divisions there is essentially but one question presented: Is there any substantial evidence that claimant's lung condition arose out of and in the course of his employment?

His employment for the last 6½ years at 8 hours a day as a "spot-blaster" is conceded. There is no contradiction of his testimony that in 1953 the first symtoms of illness he recognized were a "tired and aching feeling" and he could cough up particles of dust; that on or about June 18, 1953, he reported to Doctor Thornton, who took his temperature and gave him a shot of penicillin, and a couple of days later sent him to Doctor Kitsell.

Claimant also said: "Prior to that time, on one or more occasions due to the heat, I suffered unconsciousness or semi-unconsciousness that forced me to stop working for awhile. I would go down to First Aid and the nurse would have me lay on the table for awhile." This illness occurred several times.

Finally he was told "to take it easy" and he did not work for a couple of days. Then he went back for half a day, worked until about eleven o'clock, felt bad, and was sent to St. Francis Hospital, where X rays were taken by Doctor Kitsell, his lungs were washed out, and "a gland or something" was taken from his thigh.

He was at St. Francis about two weeks, then went home a week or two, and was examined by Drs. Thornton and Miller. He was sent to Oakdale (State Sanatorium) where he stayed two weeks and then to Iowa City (University Hospital) another two weeks, was X-rayed and another gland taken out of his neck. He has not worked since June 18 or 19, 1953. He thinks Doctor Thornton or Doctor Miller said he had "a touch of pneumonia" and that they might also have said he had bronchitis. Claimant said he told both doctors he had been working with a filtered air supply through a mask. He further explained: "I came pretty near passing out cold several times on account of the heat. It is a hot job and on those times I was wringing wet with sweat."

He testified also on redirect examination: "At the time I was employed at the Deere Tractor Works I was feeling pretty good. They examined me and the doctor passed me for work. I at times reported the unpleasant working conditions to the foreman * * *. The millwright would fix it when he had time but he was in no particular hurry about it. * * * Doctor Miller and Doctor Thornton told me they didn't know what my ailment was."

Neither Doctors Thornton, Kitsell nor Miller, apparently company doctors, were called as witnesses. But Doctor Spear, Superintendent, Medical Director of Oakdale Sanatorium, testified that Doctor Miller in his case history said: "Boeck's sarcoid, miliary tuberculosis, histoplasmosis, all considered."

Doctor Spear's own diagnosis, based on record of staff conferences and X rays, was "possible silicosis, possible Boeck's sarcoid and no clinical tuberculosis."

Two employees besides claimant, one for him and the other as a witness for the company, described the conditions under which a "spot-blaster" worked.

694

Mr. Morehead, also a "spot-blaster", explained it is a job in which small steel pellets are shot from an air hose under pressure in order to clean castings after they are removed from the mold: "I wore, while on the job, a heavy jacket and a mask and helmet to keep the dust out. After I had been in the room with the mask and helmet on for awhile, the air became real hot. The dust sometimes did get under the mask and inside the helmet, and in the morning after I awakened I could cough up black phlegm, which I believe was caused by the same dust I breathed while at work. I suffered from bronchitis about twice a year while working there and the year that I wasn't working there I didn't have bronchitis and only one cold; and that while working there, after a considerable length of time, I suffered sort of a weakened condition." He also told of another worker using the same equipment on the same job who became ill and went to Oakdale.

Claimant himself testified he worked in the "Pangborn" cabinet and "wore a heavy jacket, apron, special gloves and a helmet with a screen protected glass in the front of it. The helmet is made of rubber and inside has a section that is drawn up tightly around the neck. After you go inside the helmet is hooked up to compressed air. The room * * * is dusty because the dirt from the castings is removed by shooting against the castings buckshot from a compressed air hose. Some of the dust comes up underneath the mask. * * * the air in the Pangborn becomes hot. * * * The air hose broke at times and that kicked up more dust than usual. When it broke, I would practically run; I would get out as fast as I could. * * * They checked the air and the air filter charcoal, but not often enough because there was still a bad odor from the rust. The air comes through a pipe line from some source. * * * I complained to Mr. Rehder and the foreman about the hot air coming through my helmet. * * * A fellow by the name of Joe Scott worked on this job about three years which was the longest that anyone else ever worked on the job."

The "Pangborn" is described as a "blast cabinet" about 25 feet long and 8 feet wide. The area where claimant worked was "probably 6 feet square, with a ceiling height of 10 or 12 feet", according to the company witness.

This witness was the company safety director. His description of the mechanics of the working conditions does not vary greatly from that of the other two witnesses. He contradicts, however, that the equipment had not been operating properly "except once in awhile." He also said: "I have not personally tested the air helmet under actual working conditions." The clear inference is that the equipment was defective at least "once in awhile", and so his testimony in that regard was of little value. The same is true of his testimony that the compressed air "could have absolutely no sand or dirt particles in it" and that even if the activated charcoal were left in too long the "spot-blaster" would still get "a normal supply of pure compressed air."

We conclude there was substantial evidence of defective necessary protective equipment, and that it was not strongly denied. Therefore the only substantial contention of defendant concerns the nature of claimant's ailment and as to whether it was shown to have arisen out of his employment.

It is true claimant offered only the one medical witness, Doctor Spear, and that two doctors from the University Hospital at Iowa City testified for the defendant-employer. Doctor O'Bannon, a young intern of not too much experience with such cases, had claimant under his daily observation and supervision eighteen days. His superior officer, Doctor Hardin, concurred in Doctor O'Bannon's diagnosis of claimant's condition, though his diagnosis like Doctor Spear's was not from personal examination but from X rays, laboratory procedures and the case history. He said: "I personally examined the X rays, I have personally talked with him and personally have read his case history." The diagnosis of these doctors was Boeck's sarcoid, which Doctor Hardin said "is a chronic disease; it is a long term *infection*. It would be of eighteen to thirty-six months duration. There is no particular cure other than perhaps length of time and sufficient food and rest." (Emphasis supplied.) He further said: "No cause of Boeck's sarcoid is known. In a very rough sort of way it is analogous to the common cold—much more prolonged and unpleasant." He discounted the other suggested ailments of tuberculosis or silicosis. In that judgment he agreed

with Doctor Spear that there was no tuberculosis, but it is evident his reason for eliminating silicosis was questionable, for he said: "The case history did not indicate silicosis on such short exposure" and "I was not aware at the time Mr. Burt was here that he had been on a filtered air job since 1948, * * *." This would not have changed his diagnosis but he said: "If he has worked in a dusty atmosphere it is possible that he has silica in his lungs but whether or not the entire picture as seen on X rays could be attributed to that * * * could conceivably be explained if there was a very large concentration of dust. That is, anyone exposed to dust will breathe it in; how much is deposited depends upon the amount he breathes it." His opinion however was: "Since the cause of Boeck's sarcoid is unknown, I can't say that it could have been caused as a result of his exposure to dust in his employment."

Nevertheless, on re-cross-examination he admitted: "While we do not know the exact cause of Boeck's sarcoid, it is a general principle that any patient that is weakened to anything else is more apt to fall victim to another disease."

Furthermore, on redirect examination Doctor Hardin stated: "In the medical profession it is thought that *a general weakened* condition, *no matter what the cause,* whether lack of sleep, *occupation,* excessive drinking, *overwork,* etc., makes the human body more susceptible to infection or disease." (Emphasis supplied.)

No evidence of any other cause but occupational difficulties appears. The deputy industrial commissioner, the commissioner and the trial court felt that sufficient evidence of defective equipment, unwholesome working conditions, and the improper protection from known hazards, resulted in the general weakened condition of claimant whereby he became temporarily disabled by Boeck's sarcoid and granted compensation of "$28.00 per week for a period not exceeding 300 weeks or for so long within the statutory limits provided by section 85.33, Code of Iowa 1950, as the claimant shall continue to be disabled as a result of disease contracted in the course of his employment by said defendant * * *."

The deputy commissioner said in his findings: "Upon the medical evidence produced it clearly appears that the claimant

has failed to establish he has silicosis as a result of his exposure to dust in the place of his employment. To hold otherwise would clearly be speculation, conjecture and surmise, * * *. However, it conclusively appears from the record herein that the claimant is disabled as a result of prolonged exposure to dust in the course of his employment. That it is apparent because of such exposure and inhaling the dust he eventually was stricken, leaving him weak and unable to work. Thereby an injury was inflicted upon the claimant for which he should be compensated. * * * That as a result of prolonged exposure to dust, the claimant contracted a disease arising out of and in the course of his employment from which he was disabled for work on or about June 18, 1953, and from said date has continued to be totally temporarily disabled."

The district court upheld this determination and the defendant-employer has appealed to this court.

I. As usual in cases of this nature, we start with the statutory provisions (section 86.29, Code of Iowa, 1954) discussed and involved in many decisions of this court, viz.: "In the absence of fraud the findings of fact made by the industrial commissioner within his powers shall be conclusive." Bocian v. Armour & Co., 244 Iowa 304, 306, 56 N.W.2d 900, 901; Smith v. Soldiers' & Sailors' Memorial Hospital, 210 Iowa 691, 231 N.W. 490. As pointed out in the Bocian case cited by both parties to this action, section 86.30 elaborates by stating the court may interfere " 'on one or more of the following grounds *and on no other* [emphasis supplied] : * * *. 3. If the facts found by the commissioner do not support the order or decree. 4. If there is not sufficient competent evidence * * * to warrant the making of the order or decision'."

We are concerned with these same material provisions in the case before us. It was also said in the Bocian case: "We have repeatedly and consistently construed these provisions as making the commissioner's findings of fact conclusive where the evidence is in dispute or reasonable minds may differ on the inference fairly to be drawn from the facts. [Citing cases.] The real test is the sufficiency of the evidence to support the finding. [Citing cases.] The finding of the commissioner is on the same footing as a jury verdict. [Citing cases.] The facts here are

not in material dispute. The controversy concerns the inference to be drawn therefrom."

The court (Smith, J.) concluded in that case (page 308): "Under the record here the cause could only be ascertained by inference from the facts shown. That means, not a process of legal reasoning or conclusion, but one by which a fact is sought to be established or deduced as a logical consequence from other facts. 43 C. J. S., Inference, page 373 et seq.

"We are abidingly convinced here that the commissioner's decision involved a finding of fact and that there was sufficient competent evidence to sustain it. Had the trial court reversed the commissioner's decision it would have been error [citing cases]."

We think the proposition sound and applicable, for the cases are quite similar. There the issue was as to whether an ailment was shown to be caused by a change of work which claimant alleged was heavier and more disabling to him. The commissioner found the facts and permissible inferences did not establish the causal connection as a matter of fact, and the commissioner's decision was upheld by us. Before us now we have such facts and inferences as the commissioner believed did establish a causal connection between the employment and the disability claimant suffered. See Smith v. Soldiers' & Sailors' Mem. Hosp., supra. After a careful review the trial court felt they were sufficient to sustain the commissioner's decision, and we must agree.

II. The facts here are not in material dispute. The controversy concerns the inferences to be drawn therefrom. The claimant had shown he was in good health when employed by the employer-defendant. He worked in a hazardous occupation, especially hazardous to the respiratory system, for he had to work in a steel cabinet with special protective equipment designed to prevent dust and contaminated air from reaching his throat and lungs. It contemplated pure fresh air being forced into the helmet. This equipment was shown defective. Complaint was made that hot foul air came through the hose and smelled rusty; that dust came in, causing the claimant as well as other operators to cough up dust particles; that repairs were

not promptly made; and that the foreman, though testifying the equipment was in good shape, did not himself test the apparatus in actual working conditions. It was shown that claimant became ill on the job, developed a tired and aching feeling due to the hot air, suffered unconsciousness or semiunconsciousness which forced him to stop working, and finally after several such occasions was forced to go to the first-aid station for relief. As a result he was sent to a doctor for examination and treatment.

There is substantial evidence here of an existing condition which a jury could find so weakened claimant's general physical condition, and especially his lungs, that his lungs became infected in a manner described by the medical testimony, and whether claimant suffered Boeck's sarcoid, tuberculosis, silicosis, or a disabling cold, makes little or no difference. The commissioner was satisfied the facts and inferences established the cause as the unhealthy working conditions furnished by the employer, and we think the inferences, if not the actual facts, disclosed, were sufficient to justify that conclusion.

It is true the doctors testifying for the defendant stated in their opinion the medical data they had compiled, including an incomplete history, indicated that his employment contributed nothing to his condition, but such opinion is of course not always binding upon the commissioner or upon the court. It is to be weighed together with the other disclosed facts and circumstances, and the ultimate conclusion is for the finder of the fact. Nellis v. Quealy, 237 Iowa 507, 21 N.W.2d 584; Hinrichs v. Davenport Locomotive Works, 203 Iowa 1395, 1397, 214 N.W. 585, 586. He worked under conditions which even a layman knows will result in illness of some sort, and he did become ill. If claimant, under such exposure or conditions as were related, had taken pneumonia or bronchitis, as witness Morehead said he suffered while working in those conditions, or a common cold which disabled him, he would, we think, be entitled to have the question of fact as to the cause determined by the fact-finding authority. Black v. Creston Auto Co., 225 Iowa 671, 281 N.W. 189. The cause here was not left to uncertainty or conjecture. From the proven circumstances the fact-finding authority has

a right to draw conclusions that are natural and reasonable. 53 Am. Jur., Trial, section 159, page 144; Almquist v. Shenandoah Nurseries, 218 Iowa 724, 254 N.W. 35, 94 A. L. R. 573.

 III. Our statutory formula (section 85.3, Code of Iowa, 1954) for defining compensable injuries, viz., those "arising out of and in the course of the employment," is not uncommon in workmen's compensation statutes. 58 Am. Jur., Workmen's Compensation, section 209, page 716. The first part, "arising out of", involves the idea of causal relationship between the employment and the injury. Idem, section 210. The injury must result from, i.e., "arising out of", the employment. We have said, however, an injury received while the employee is not doing any act of service may nevertheless be "arising out of * * * the employment" if it can reasonably be said it resulted from a hazard of the employment. Griffith v. Norwood White Coal Co., 229 Iowa 496, 502, 294 N.W. 741. It is true there must be a causal connection, and the injury or disability must be a rational consequence of the hazard connected with the employment. There is no contention here that the later part of the formula is not applicable, viz., "in the course of the employment." He became ill while at work. If then there is sufficient evidence to support the conclusion that there was reasonable probability claimant's condition, whether it be labeled Boeck's sarcoid or whether it remains unnamed, was caused or contributed to by his employment, there can be no question of its "arising out of" his employment.

In Ford v. Goode, 240 Iowa 1219, 38 N.W.2d 158, we held that proof of certainty is not necessary and that the law was content with probabilities. It is sufficient if the injured workman produces sufficient evidence to persuade the commissioner that the injury probably arose out of and in the course of the employment.

The court said in In re McNicol, 215 Mass. 497, 499, 102 N.E. 697, L. R. A. 1916A 306: "It 'arises out of' the employment, when there is apparent to the rational mind, *upon consideration of all the circumstances,* a causal connection between the conditions under which the work is required to be performed and the resulting injury. Under this test, if the injury can be seen to have followed as a natural incident of the work and to have been

contemplated by a reasonable person *familiar with the whole situation* as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment." (Emphasis supplied.)

Also see Reddick v. Grand Union Tea Co., 230 Iowa 108, 116, 296 N.W. 800, 804, where we said: "We think the record also presents sufficient evidence that the injury arose out of the employment; that is, a causal connection fairly appears between the conditions under which the work was performed and the resulting injury—the injury followed as a natural incident of the work."

In that case claimant recovered as a result of the death of the employee by carbon monoxide poisoning from a car exhaust in the place where he was required to work.

IV. Did the record disclose the existence of facts or inferences tending to establish a causal connection? Was the causal connection a question of fact, or did the record fail to disclose facts or circumstances tending to establish the cause of claimant's disability? The general rule of course is that the commissioner's finding must be based on testimony that tends to establish that fact or, upon proper inference, that may be drawn therefrom. It cannot be predicated upon conjecture, speculation or mere surmise. Boswell v. Kearns Garden Chapel Funeral Home, 227 Iowa 344, 288 N.W. 402.

In Sparks v. Consolidated Indiana Coal Co., 195 Iowa 334, 190 N.W. 593, relied upon by defendant, the evidence tended to establish the claim was a slight bruise upon the decedent's head, which the doctors testified was not the cause of death. The only evidence of a causal connection of employment was that perhaps a piece of kobo had fallen in the mine and struck decedent in the face. We reversed in that case, stating the cause was established by "merest speculation."

The testimony before us goes much further, and while the doctors for defendant admitted it was "possible" that his trouble arose out of his employment, that concession is not the basis of Burt's claim herein. It must be conceded that evidence of mere possibility alone would not be sufficient (Boswell v. Kearns Garden Chapel Funeral Home and Sparks v. Consoli-

dated Indiana Coal Co., both supra), and if the only evidence here of a causal connection was that statement of defendant's doctors, then it would fail. However, as pointed out in Division II hereof, there was much more in the way of facts and clear inferences disclosed which we think are compelling inferences that claimant suffered his disability as a direct result of the unsafe and unhealthy working conditions in his employment. Black v. Creston Auto Co., supra.

Perhaps our latest consideration of this matter was in Nellis v. Quealy, supra, 237 Iowa 507, 511, 21 N.W.2d 584, 586, where we rejected defendant's argument that because the doctor's testimony went no further than to show a possibility of causal connection between the foreign substances in the eye and the ultimate disability, the commissioner could not find as a fact that there was such a causal connection. We held it was not necessarily conclusive when claimant's doctor said the condition was *possibly* caused by the foreign substance in the eye, so that the commissioner would not thereafter be permitted to determine the causal connection. This is certainly the sensible rule, for we cannot hold that no matter what the other evidence tended to prove, if the doctors said the causal connection was "possible" instead of "probable", then the courts and fact-finding bodies would be powerless to grant relief. Such a surrender of the judicial processes is unthinkable.

In the Nellis case at page 512 we cited with approval Hinrichs v. Davenport Locomotive Works, 203 Iowa 1395, 1397, 214 N.W. 585, 586, where we also held it was the province of the industrial commissioner to accept the testimony of the experts " 'as seemed to him most consistent with all the testimony, and of the greater credibility'." We said: " 'The testimony of appellee that he suffered constant pain in his eye from the time of the injury must be given considerable weight on the issue of causal connection'."

Here as in the Nellis case, in addition to such medical testimony, there is direct testimony that claimant did get foreign substances in his lungs, and complained of suffering from the hot and rancid air pumped to him.

The correct rule is that not only must the doctor's testimony be taken in its entirety, but all other testimony bearing on

the causal connection between the illness and the disability must be considered in determining whether the commissioner was justified in his finding that the injury (lung infection and disability) resulted from the effects of the dust and hot rancid air claimant was forced to endure in his employment. We must therefore permit the commissioner to consider the experts' opinions along with the other facts and inferences, if there be such introduced, to determine whether there was the necessary causal connection between injury and disability to permit a recovery.

From the record it is abundantly clear that the history given these doctors was not complete, and in any event unless it includes the material matters introduced in evidence, such expert opinions should not be accepted as conclusive. It is also worthy of note that the medical testimony was by deposition taken-February 10, 1954, and the doctors were not present at the hearing before the deputy commissioner June 10, 1954, for further examination in connection with the other evidence introduced. They were not fully informed.

V. While we feel the claimant needs no aid in the reasonable determination of the actual or contributing cause of the admitted disability, the rule is well settled in Iowa that when considering such appeals we will consider the evidence in the light most favorable to the claimant. Schmidt v. Pittsburgh Plate Glass Co., 243 Iowa 1307, 1316, 55 N.W.2d 227, 232; Brewer v. Central Construction Co., 241 Iowa 799, 801, 43 N.W. 2d 131, 133; Pohler v. T. W. Snow Constr. Co., 239 Iowa 1018, 1021, 33 N.W.2d 416, 418. Considered in its most favorable light, it must be said that claimant furnished substantial evidence that his condition or ailment, a lung infection, arose out of his employment.

We arrive at the conclusion that the case must be affirmed. —Affirmed.

OLIVER, C.J., and GARFIELD, BLISS and HAYS, JJ., concur.

SMITH, WENNERSTRUM, THOMPSON, and PETERSON, JJ., dissent.

SMITH, J. (dissenting)—A considerable study of the record and briefs, even before the majority opinion was submitted, had

led me to conclude the decision of the trial court, affirming the commissioner's award, should on principle be reversed. Further study and reflection have strongly confirmed that conclusion in my mind.

The distinction between the relation of cause and effect of two events, and their mere adventitious sequence in time—the difference, that is, between causal and casual—is peculiarly liable to be blurred, even in ordinary affairs. The danger of confusion multiplies when the layman assumes to determine the origin or cause of a rare human ailment with no precedent trauma or occurrence to indicate a probable cause and no medical expert opinion that such probability exists. Such attempt must be branded as speculative and unsound.

I. I have found no case, and neither claimant's brief nor the majority opinion cites any, in which a jury or commissioner or a court acting in a fact-finding capacity has been permitted, or has assumed authority, to determine a causal relationship exists in such a case when the uncontradicted medical testimony is that the profession has been unable to discover even a probable cause of a given disease.

It is true, when the expert testimony is in conflict, the fact-finding official or body must resolve the conflict. It becomes a question of fact. But in the absence of any expert testimony based on the study of a sufficient number of clinical cases to justify even a tentative professional medical opinion of *probable cause and effect,* the matter is, in my opinion, too speculative and conjectural to warrant a judicial pronouncement.

The diagnosis of claimant's ailment, as shown by the record, is conclusive and without conflict, that he was suffering from what the profession has identified and named sarcoidosis or "Boeck's sarcoid." I find in the record no reason for thinking that diagnosis was based on insufficient knowledge of claimant's case history and symptoms to warrant the diagnosis. The doctors knew all that claimant and his lawyer revealed. Nothing material to the diagnosis seems to have been overlooked.

The three Waterloo doctors (assumed by the majority opinion to be "company doctors"—which certainly can make no difference in the case, even if true) were apparently puzzled. They

(or someone, it is immaterial who) did the wise and proper thing by sending claimant to Oakdale Sanatorium since there was some suspicion of tuberculosis. The record does reveal indirectly that Doctor Miller, one of the three, considered Boeck's sarcoid along with miliary tuberculosis and histoplasmosis.

Doctor Spear of Oakdale, speaking for himself and the Sanatorium staff, definitely eliminated tuberculosis, and left remaining "possible silicosis and possible Boeck's sarcoid." He made no final decision between those two. Presumably that was the purpose of sending him (claimant) to Iowa City.

The record does not reveal who then sent him. That too is immaterial. The search was still on for definite diagnosis. From Iowa City we have the only medical testimony in the case other than that of Doctor Spear.

Doctor O'Bannon is referred to by the majority as "a young intern of not too much experience with such cases." The record shows he had had four years of premedical and four years medical, six months general practice, a year rotating internship, and three years active duty in the United States Navy Medical Corps, before he came to the University Hospital as "a resident in a rotating general practice program." As to the extent of his experience I only find this sentence (from his cross-examination): "I have not had occasion to treat a large number of patients with silicosis. There is some similarity in the clinical picture between silicosis and Boeck's sarcoid, but where we can definitely gain a diagnosis of Boeck's sarcoid the existence of silicosis becomes less probable although it may be possible." Doubtless he had access to whatever experience and thinking his profession had assembled on the subject.

Doctor Hardin, Doctor O'Bannon's superior, also diagnosed claimant's case as Boeck's sarcoid. I am not sure the record bears out the majority statement that his diagnosis was "not from personal examination." The contrary seems to be true. He testifies that "when the house officer makes a diagnosis * * * my confirmation * * * is based upon my personal knowledge of the patient * * *." With reference to claimant here he says:

"All the procedures tried on Mr. Burt were at my direction and supervision. I personally examined the X-rays, I have per-

sonally talked with him and have personally read his case history.

"My diagnosis * * * based upon X-rays, laboratory procedures, the case history, examination and *study of the patient,* and everything else was Boeck's sarcoid." (Emphasis supplied.)

It would be difficult to find a record more free from conflict and doubt as to diagnosis.

II. The exact nature of claimant's disease being established the question of cause next arises. Again, the medical testimony is without conflict and the pronouncement undisputed. Doctor Spear expressed no opinion as to cause.

Doctor O'Bannon testified: "It (Boeck's sarcoid) is a disease, ailment or sickness that anybody can contract regardless of their occupation. * * * There is no cause or cure * * *." Again he says:

"The cause of Boeck's sarcoid has not been established in the medical field and I don't know if Boeck's sarcoid could have been caused by Mr. Burt's occupation.

"It is possible that an individual suffering from a general weakened condition would be more susceptible to Boeck's sarcoid than the normal healthy individual."

On a final re-cross-examination the doctor said: "In my opinion, the medical data that we have compiled in the case of Mr. Burt indicates that his employment contributed nothing to his condition."

Doctor Hardin said: "Boeck's sarcoid is a chronic disease; it is a long term infection. * * * No cause of Boeck's sarcoid is known. In a very rough sort of way it is analogous to the common cold—much more prolonged and unpleasant." Later on cross-examination he testified: "Since the cause of Boeck's sarcoid is unknown, I can't say that it could have been caused as a result of his exposure to dust in his employment." There is no showing that the "infection" could result from breathing dust.

III. I shall not cite the many cases that hold the burden of proof is on claimant to establish that his injury arose out of, as well as in the course of, his employment. They will be found

under paragraph 101 in the annotations to Code section 85.61, in 5 Iowa Code Annotated, at pages 406, 407.

And while the commissioner's finding may be based on circumstantial evidence and on the reasonable inferences that may be drawn from the evidence, "it cannot, however, be predicated upon conjecture, speculation, or mere surmise." Sparks v. Consolidated Indiana Coal Co., 195 Iowa 334, 338, 190 N.W. 593, 594. The inference must be reasonable. Conjecture or guesswork will not suffice. Idem, citing Clapp's Parking Station v. Industrial Acc. Com., 51 Cal. App. 624, 197 P. 369.

IV. The majority opinion assumes this is a case similar to Bocian v. Armour & Co., 244 Iowa 304, 56 N.W.2d 900, and others which emphasize the thought that the commissioner's finding is conclusive if sustained by *inference* from the facts shown. In the Bocian case the expert opinion was in direct conflict upon the question of causality. The opinion pointed out that the difference in opinion created a factual dispute rather than a question of law.

It is not here a question of the right of the fact-finding authority to draw and rely on inferences where facts are in dispute but there is vast and important difference between legitimate *inference* and *speculation*. And for a layman to attempt to "infer" a causal connection in a technical matter where the experts are unable to draw it can only be branded as mere speculation. The record indicates that claimant's first "symptoms" were reported by him after he had worked five or six years. There is no testimony of his habits and living conditions or history.

The majority here cites Black v. Creston Auto Co., 225 Iowa 671, 281 N.W. 189, to this sweeping generalization: "If claimant, under such exposure or conditions as were related, had taken pneumonia or bronchitis * * * or a common cold which disabled him, he would, we think, be entitled to have the question of fact as to the cause determined by the fact-finding authority."

Of course that statement omits the very condition present here—the uncontradicted, unanimous medical testimony that the cause of a rare disease is still unknown, and the medical opinion that there was only a possibility that it might have arisen out of the employment.

Furthermore, I find no language in the Black case that warrants the statement above quoted. As I read it, the opinion in that case merely holds the commissioner erred in holding the lead poisoning suffered by claimant was an occupational disease (at that time not compensable) ; and in denying compensation because there was "no evidence of a specific injury at any fixed and certain date."

The opinion in Nellis v. Quealy, 237 Iowa 507, 509, 21 N.W.2d 584, 585, is also cited. Its dissimilarity to the instant case is best shown by its own statement: "The medical testimony was to the effect that claimant's loss of vision was caused by scar tissue resulting from ulcers, *but Dr. Martin * * * and Dr. Chase * * * differed as to the probable cause of the ulcers.*" (Emphasis supplied.)

So also as to the opinion in Hinrichs v. Davenport Locomotive Works, 203 Iowa 1395, 1397, 214 N.W. 585, 586, in which there was conflict of medical testimony, which says: "While there is disagreement in the testimony of the expert witnesses, it was peculiarly the province of the industrial commissioner to accept the testimony of such of these witnesses as seemed to him most consistent with all the testimony, and of the greater credibility.''

Almquist v. Shenandoah Nurseries, 218 Iowa 724, 254 N.W. 35, 94 A. L. R. 573, also cited, involved no allowance of compensation in face of uncontradicted expert testimony. Its importance is the holding that the personal injury, to be compensable, need not be the result of a physical accident or trauma. There is here no such contention.

I have said enough to make clear my disagreement with the majority. I respectfully dissent.

WENNERSTRUM, THOMPSON, and PETERSON, JJ., join in this dissent.