HERMAN HEMKER, employer, and FEDERATED MUTUAL IMPLEMENT AND HARDWARE INSURANCE COMPANY, insurance carrier, appellants, v. AMELIA K. DROBNEY, claimant-appellee.

No. 50437.

JANUARY 9, 1962.

Shull, Marshall, Mayne, Marks & Vizintos, of Sioux City, for appellants.

A. C. Carmichael, of Pocahontas, and Linnan, Lynch & Straub, of Algona, for appellee.

LARSON, J.—Pursuant to the filing of an application for an award of compensation under the workmen's compensation law in which the widow, Amelia K. Drobney, alleged her husband was injured while delivering a mattress and spring for his employer and died shortly thereafter, the defendant employer Herman Hemker and his insurance carrier, Federated Mutual Implement and Hardware Insurance Company, answered denying the employee died as a result of any injuries sustained in said labor and denied he sustained any injury in the course of his employment.

The deputy commissioner, after the evidence was in, found as a matter of fact that claimant had failed to prove by a preponderance of the evidence that decedent sustained an injury arising out of and in the course of his employment, or establish a causal connection between the employment and the death, or that the employment aggravated or accelerated decedent's diseased condition and was thereby a proximate contributing cause of his death. Award was denied.

On review the commissioner approved the decision of his deputy and, when the district court reversed, defendants appealed. We cannot sustain the court's decision.

I. At the start we are reminded of the statutory admonition, "In the absence of fraud the findings of fact made by the industrial commissioner within his powers shall be conclusive." Section 86.29, Code, 1958. Section 86.30, elaborates thereon by providing that the court may interfere "on one or more of the following grounds and on no other: * * *." The statute lists four grounds but our concern here is with "3. If the facts found by the commissioner do not support the order or decree" and "4. If there is not sufficient competent evidence * * * to warrant the making of the order or decision."

In a long line of cases we have consistently construed these provisions as making the commissioner's findings of fact conclusive where the evidence is in dispute or where reasonable minds may differ on the inference fairly to be drawn from the

facts. Hassebroch v. Weaver Construction Co., 246 Iowa 622, 625, 67 N.W.2d 549; Bocian v. Armour & Co., 244 Iowa 304, 306, 56 N.W.2d 900, 901; Burt v. John Deere Waterloo Tractor Works, 247 Iowa 691, 697, 73 N.W.2d 732, 733; Taylor v. Horning, 240 Iowa 888, 890, 38 N.W.2d 105; Bruner v. Klassi, 241 Iowa 1007, 1011, 44 N.W.2d 366; Lindahl v. L. O. Boggs Co., 236 Iowa 296, 307, 18 N.W.2d 607; Nellis v. Quealy, 237 Iowa 507, 511, 21 N.W.2d 584, and citations.

■ As in most appeals of this nature, the real test or issue is as to the sufficiency of the evidence to support the commissioner's findings. Littell v. Lagomarcino Grupe Co., 235 Iowa 523, 530, 17 N.W.2d 120, and citations. In that regard we have repeatedly stated the finding of the commissioner is on the same footing as a jury verdict (Bocian v. Armour & Co., supra; Kent v. Kent, 202 Iowa 1044, 1046, 208 N.W. 709), although in the matter of construction we have said the findings of the commissioner should be construed even more liberally than those of a court. Rose v. John Deere Ottumwa Works, 247 Iowa 900, 907, 76 N.W.2d 756. As a basis for such liberal construction we pointed out that section 86.18 provides the commissioner and his deputies shall not be bound by technical or formal rules of procedure, citing Stice v. Consolidated Indiana Coal Co., 228 Iowa 1031, 1041, 291 N.W. 452. Clearly, then, the findings of the commissioner are to be broadly and liberally construed and will be construed to uphold rather than to defeat his decision. In this regard we approved in the Rose v. John Deere case the rule that a finding of the ultimate facts is sufficient to sustain an award, and it is not necessary to set forth the minor facts leading to the determination of the ultimate one. The sufficiency of findings of fact in workmen's compensation matters is extensively annotated in 146 A. L. R. 123.

■■ One other rule to be kept in mind as we consider the evidence introduced herein appears in a recent decision of this court. In Daggett v. Nebraska-Eastern Express, Inc., 252 Iowa 341, 351, 107 N.W.2d 102, 108, we said, "Our question is not whether there is sufficient evidence to warrant a decision the commissioner did not make but whether there is sufficient evidence to warrant the decision he did make." Thus the evidence

may and perhaps here would have supported an award had that been the commissioner's decision. However, we are satisfied it was such that reasonable minds might differ and thus could not be disturbed by the court. Certainly the weight given otherwise relevant and competent testimony in making his findings was solely for the commissioner and not for the court.

II. The evidence introduced, with the exception of the opinions expressed by medical experts as to the cause of decedent's death and its relationship to his work at the time, is not a matter of great dispute. The controversy here surrounds the competency and sufficiency of the opinions expressed by the doctors for defendants in response to hypothetical questions based upon a pathologist's report and a statement of decedent's activities just prior to his death.

Six doctors, all well qualified as medical experts, testified in response to hypothetical questions, and each expressed his opinion as to the cause of death and as to its connection, or lack thereof, with the duties decedent was performing for his employer. None had treated the decedent but had studied the pathologist's report made as a result of an autopsy ordered by the county coroner. In addition to these reports, each was given substantially the activities and events leading up to decedent's death on February 22, 1959. Those were that Clayton A. Drobney, 38, had been employed by defendant Hemker for three or four years as a clerk and deliveryman in a hardware and furniture store. He had had no recent falls or injuries, little or no illness over that period, but had been doing considerable additional physical labor after his regular hours of employment, such as painting, carpenter work, plumbing, wiring, and heating installations. He was a good fast worker and had been accustomed to delivering much heavier items. In the distant past he had suffered some drinking problems.

On Sunday, February 22, 1959, at about 3:30 p.m., he was called to work by his employer and assisted in loading, unloading and installing a new spring and mattress on a bed in the Shimon residence. The mattress weighed approximately 60 to 62 pounds and the box spring 70 to 72 pounds. They were carried separately by both men, first from the warehouse to the

truck, some 75 feet, and then from the truck some 25 feet to the house, up three or four steps, and into the living room. After removing the old spring and mattress from the bed, they removed the paper wrapping from the new mattress and spring. This was "quite a struggle", as was the job of moving the cumbersome but not heavy articles down a narrow hall and into the bedroom. The house was very warm and both men perspired freely. As they were placing the new mattress on the bed, decedent's foot struck a vacuum cleaner, or some such object on the floor, and he dropped his end of it some 10 or 12 inches above the spring. He did not fall. He then left the room, picked up some wrapping paper, and went outside. When he did not respond to a request by his employer, it was discovered he was ill, and he was returned to the house. His wife and a doctor were called, and he was taken to a Fort Dodge hospital, where he died two hours later. His wife said that when she arrived at the Shimon residence "his eyes were kind of crossed and wavery; his one arm didn't have any reflex action in it. He was sitting there and kind of rubbing his head, his tummy, his legs, and he just didn't know what was wrong with him, and he wanted to explain to me something was very wrong. * * * I was never again able to talk or visit with him." An autopsy was performed and it was introduced into evidence by both parties as a basis for medical testimony.

Dr. Raymond J. Harrington and Dr. Robert N. Larimer testified for defendants in depositions taken ten days before the hearing before the deputy commissioner. Doctor Harrington testified the cause of death was a cerebral hemorrhage which was the result of the rupture of a large blood vessel and that the rupture originated from a congenital berry aneurysm or from a diseased artery probably the result of arteriosclerosis. He testified:

"Q. Would either of those conditions * * * in your opinion have any causal connection with the man's employment at the time of his death? A. I would say no. I would say it would be due to natural causes.

"Q. Was this condition from which he died, will you state whether or not it was one which under any rational work was

likely to progress so as finally to disable him? A. That is the course they nearly all follow. If a person has a weakness in the blood vessel of this sort, sooner or later it is bound to disrupt and result in this sort of thing.

"Q. Is that the result of the natural progress of the disease? A. I would say so. * * * In the layman's sense of the term, this patient died of a stroke due to a rupture of a diseased artery. This disease process was arteriosclerotic in nature * * *. The question of whether exertion is a factor in bringing about a cerebral hemorrhage is a questionable thing * * *. There are instances of where extreme exertion might be an aggravating factor but it would not necessarily be a causative factor."

On cross-examination he further testified:

"Q. If he had what you say there from your opinion and that was aggravated, could that be aggravated by the handling of this merchandise commonly known to be the most difficult in furniture to handle, would that make any difference in your opinion of maybe having caused this aggravated situation of this condition to have created the bursting of the blood vessel and hemorrhage? A. I would say not.

"Q. * * * While these two gentlemen are carrying this article, through something on the floor, or other causes, this decedent is caused to stumble and fall and he drops this mattress or this article, and from and after that, having done that, he is all done. * * * From then on he goes into this sort of stary eyes, left arm droops, he sits down in a chair, then is taken to a hospital and the doctors work on him. Would you say that dropping that could have caused this cerebral hemorrhage or condition? A. No, I would say not.

"Q. You would say not? A. No."

Doctor Larimer, called by the defendants, also testified "My opinion is he died as the result of hemorrhage from a ruptured aneurysm on the Circle of Willis. * * * In my opinion the aneurysm probably had been there since Mr. Drobney was born. It gradually developed and like aneurysms in general, there comes a time when they do rupture. This was the time his did rupture. * * *."

He further testified such weakness progresses and never heals. The decedent's did progress and did rupture as might be expected while doing any rational work.

He further stated that, according to the pathological report, decedent had polycystic kidneys, and testified as follows:

"Q. Did the polycystic kidneys have any significance in the case, in your opinion? A. I think they represent a serious situation which in and of themselves could have produced catastrophe for this man later on.

"Q. Would that have any bearing upon his blood pressure? A. Yes sir * * * One would expect the blood pressure to be increased.

"Q. Would that have any connection with his attack? A. That is raising a speculative thing which in my opinion would be of some importance. By way of explanation to this I would say that any increase in blood pressure might hasten the rupture of the aneurysm.

"Q. Was the rupture of this aneurysm something that could happen at any time regardless of what Mr. Drobney was doing? A. Yes, sir.

"Q. Do you have an opinion as to whether or not there was any causal connection between the employment in which Mr. Drobney was engaged immediately before his death and this attack? Do you have an opinion first? A. Yes, sir.

"Q. What is that opinion? A. My opinion is this man was actually doomed to die either from a rupture of this aneurysm or an increase in the damage to his kidneys * * *. I am very doubtful if his death could be blamed on any single incident."

Our attention is also called to the fact that subsequent to the hearing before the deputy commissioner it was stipulated between the parties that certain additional facts developed at the hearing were submitted to Doctors Harrington and Larimer for their consideration in the hypothetical question placed before them when the depositions were taken, and that such facts would not change their opinion that Mr. Drobney's death was due to natural causes, and that there was no causal connection between his employment and the attack precipitating

his death; further, that the condition from which he died was one which under any rational work was likely to progress so as finally to disable him.

It is appellants' contention the evidence submitted in the stipulation alone, without any other evidence, is sufficient to sustain the commissioner's decision. We are inclined to agree that these opinions so construed, if believed by the commissioner, were sufficient to sustain his decision, for he could also find the work decedent was doing was not excessive or not shown to be of the nature that would abnormally raise his blood pressure to a point that would cause or aggravate the disease.

It is true, Drs. C. L. Plott, Robert A. Hayne, J. M. Rhodes, and Clyde J. Smith, gave their opinions that the work decedent was doing could have raised his blood pressure and did aggravate the weakness in the ruptured blood vessel causing decedent's death. All but one agreed with defendants' doctors that the facts revealed in the pathological report clearly indicated a congenital aneurysm or weakness in the ruptured artery, but felt the weakness gave way because of the haste, excitement and difficulties experienced in his work at that time.

Sufficient testimony has been set out to establish a conflict in the experts' opinions submitted to the commissioner. It is not within our province to weigh it. In our determination whether or not there is substantial competent evidence to support the commissioner's finding, the conflict in expert opinion is to be considered. Bocian v. Armour & Co., supra, 244 Iowa 304, 308, 56 N.W.2d 900; Reynolds v. George & Hoyt, 230 Iowa 1267, 1271, 300 N.W. 530; Eveland v. Newell Constr. and Mach. Co., 236 Iowa 204, 17 N.W.2d 524. The difference of medical opinion, we said in the Bocian case, does not require for its solution a conclusion of law as distinguished from a finding of fact, and while the differentiation is not always easily made, there seems to be no contention here that this dispute is one of fact. Thus, if the evidence was properly admitted, the testimony was sufficient to raise questions of fact upon which the finding of the commissioner was final.

 III. Was this opinion of defendants' doctors properly

considered? We think it was, even though we have usually required compliance with rules of evidence on important evidentiary questions before the commissioner. Schuler v. Cudahy Packing Co., 223 Iowa 1323, 1327, 275 N.W. 39. The applicable statute, section 86.18, provides in such a hearing "* * * neither * * * the commissioner nor his deputies shall be bound by common-law or statutory rules of evidence or by technical or formal rules of procedure * * *." See The Iowa Law of Workmen's Compensation, S.U.I., 1960, pages 107 and 108, and citations therein.

Nevertheless, a careful examination of the testimony of each doctor reveals that each had properly considered the findings by the pathologist rather than his conclusions, drew his own conclusions from the facts stated, and gave his own opinion as to the cause of the rupture, and whether it was or might have been connected in any way with his activities or work at that time. This was proper. See In re Estate of Scanlan, 246 Iowa 52, 55, 67 N.W.2d 5. Also see an article in Vanderbilt Law Review, Volume 5, No. 3, April 1952, Expert Testimony, by Mason Ladd. As pointed out, the pathological report was introduced in evidence by both parties without objection that it was hearsay. It is true some opinions of the pathologist appear in the report, such as, that the rupture was the result of a congenital aneurysm (weakness of the artery since birth), but the report also disclosed the break was so bad it was impossible to tell with certainty the prior condition. On this question each expert gave his own conclusion from the conditions found. The heart enlargement, some mild atherosclerosis at the base of the brain, and very diseased kidneys were discovered, and these were considered by the experts as having a bearing on the cause of death. It is fair to say the experts, who were all permitted to examine that report and were substantially given the other facts as to his activity at that time, gave their own respective opinions as to the cause of the death and its possible or probable connection with his work. Thus, even under the strict rules of evidence, these opinions were admissible and the weight given them was for the finder of fact, the commissioner or his deputy. He could believe or disbelieve them. Lindeken v.

Lowden, 229 Iowa 645, 658, 295 N.W. 112; Featherson v. Continental-Keller Co., 225 Iowa 119, 121, 279 N.W. 432. He could have found, as he did, that the increased blood pressure which caused the rupture arose from physical defects rather than the exercise decedent was doing, and that had he been at home rocking in his chair the same thing would have happened. Even claimant's doctors said it could have occurred while he was in bed or when carrying out an ash can.

IV. The deputy commissioner and the commissioner found specifically that claimant failed to carry her burden to prove by a preponderance of the evidence that her husband sustained an injury arising out of and in the course of his employment, failed to prove a necessary causal connection, or that the employment aggravated or accelerated the diseased condition of Clayton and was a proximate contributing cause of death.

The burden to prove these things, of course, was upon claimant. It is apparent from the commissioner's decision that both he and his deputy felt the competent evidence, plus all reasonable inferences to be drawn therefrom, did no more than disclose a possibility that the rupture had anything to do with the duties Drobney was then performing. They concluded such evidence was without probative value, being speculative only. In other words, they agreed with the experts for defendants and found claimant had not satisfactorily established as a fact that Drobney's work at that time had anything to do with the rupture of a diseased blood vessel which caused his death. Smith v. Marshall Ice Co., 204 Iowa 1348, 217 N.W. 264. We cannot under this record say that such a finding has no substantial support in the record, and must therefore conclude the trial court was in error in doing so and in reversing the commissioner's finding on these decisive issues. Its judgment must, therefore, be reversed and the decision of the commissioner reestablished.—Reversed.

All JUSTICES concur except BLISS, J., not sitting.